IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

LONNIE KIRK,

                Plaintiff,

v.

DRM TOY, LLC d/b/a
McGEORGE TOYOTA;
and
DAVID R. McGEORGE CAR CO., INC.
d/b/a McGEORGE TOYOTA

                Defendants.

Civil Action No. 3:21-cv-00024

## COMPLAINT

Plaintiff Lonnie Kirk ("Plaintiff" or "Kirk") respectfully moves for judgment against DRM TOY, LLC d/b/a McGeorge Toyota and David R. McGeorge Car Co., Inc. (collectively "Defendant" or "McGeorge") by and for the following reasons:

### Introduction

1. Plaintiff brings this claim against Defendant for violating the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), and the Employee Retirement Income Security Act 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

2. Plaintiff suffers from at least two disabilities including heart disease (he's suffered at least one heart attack) and Dupuytren's contracture (commonly called "Viking's disease") which causes a deformity of his hand and fingers for which he required surgery. Kirk is suing McGeorge for intentionally: discriminating against him because of his disability, denying him a reasonable accommodation, retaliating against him for requesting an accommodation, terminating him in violation of the ADA; and interfering with his right to recover benefits in

violation of ERISA by terminating him to prevent receiving benefits to which he was entitled.

## Jurisdiction and Venue

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. The Defendant is subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Kirk is a resident and citizen of the Commonwealth of Virginia, and former employee of the Defendant.

7. McGeorge is Kirk's former employer.

8. Upon information and belief, McGeorge employs more than 100 employees.

9. Kirk was an "employee" as defined by the ADA.

10. McGeorge was an "employer" as defined by the ADA and, on information and belief, is a "person" that operated an employee welfare benefit plan within the meaning of ERISA.

## Facts

11. McGeorge Toyota is a car dealership and auto service business located on West Broad Street in Henrico County, Virginia.

12. Kirk was hired by McGeorge Toyota as a car salesman in June 2018.

13. McGeorge offers its employees the option to receive for themselves and/or family members one or more employee welfare benefit plans, including a health insurance plan, and a short/long term disability plan.

14. Kirk opted-in to, and paid premiums in order to, participate in McGeorge's health insurance and short/long term disability plans.

15. Mr. Kirk suffers from a condition called Dupuytren's contracture (a/k/a Viking's disease). Dupuytren's is a chronic condition that is believed to be inherited genetically, progressively worsens over a person's lifetime, and is uncurable. The disease causes the muscles of the hand to unnaturally constrict, preventing the person from the ability to uncurl their fingers or open their hand fully. In severe cases, like Kirk's, the hand is noticeably deformed and contorted at all times.

16. McGeorge was aware of Kirk's hand disability at the time of his hire.

17. Kirk was able to perform his car salesman duties despite his contorted hand caused by his condition.

18. In or about November 2018, Kirk informed his sales supervisors that he would need to go on leave for surgery on his hand.

19. Kirk's supervisors told him to hold off on getting his surgery until after the month of December's "Toyota-thon" sales event which they told him historically was a good month to sell cars for McGeorge. They told Kirk that typically January and February were slow sales months.

20. Based on the request of his sales supervisor, Kirk held off until January 2019 to schedule his hand surgery.

21. In December 2018 Kirk was medically cleared for surgery. Sales Manager

Kenneth Puryear told Kirk to let Tracey Uwen in human resources (HR) know about the surgery.

22. Ms. Uwen also recommended that Kirk wait until January for his surgery based on the type of insurance he had and that his annual co-pay or deductible maximum would be reached in 2019 which could save him out of pocket costs for the rest of 2019. Ms. Uwen also confirmed that Kirk had short/long-term disability benefits through Boston Mutual, and said it was a good thing that Kirk had those benefits as most employees did not select that coverage.

23. In early January 2019, McGeorge provided performance feedback to all sales employees. Kirk was told that he was meeting McGeorge's performance expectations. Specifically, Chris McDonnell, the Sales Supervisor, verbally confirmed that Mr. Kirk had the "highest gross per deal" among all the sales staff.  Also in that meeting, Tony Thaxton, the Sales Manager, stated that Mr. Kirk was one of the hardest working sales people at McGeorge.

24. On or about January 14, Kirk informed Tracey Uwen, the HR assistant, that he was ready to go out for surgery as soon as it could be scheduled. Ms. Uwen informed Kirk that he needed to obtain documentation from his surgeon including the surgery code and diagnosis code.

25. In response to HR's direction, Kirk called his doctor's office, obtained the requested paperwork, and printed out multiple copies of the requested documentation using a McGeorge printer.

26. On or about January 17, 2019, Kirk submitted to HR employee Uwen the paperwork she had requested, informed her that the surgery on his hand would be the following week, on January 23, 2019, and asked her for paperwork to apply for short-term disability benefits for his absence.

27. Kirk stated it was his intent to return to work at McGeorge two weeks following

his surgery.

28. Kirk's request on January 17, 2019 for a brief leave of absence to undergo surgery:

    a. was a request for reasonable accommodation under the ADA; and

    b. put McGeorge on notice of his intent to use employee welfare health insurance and/or short/long-term disability benefits under McGeorge's ERISA plan(s).

29. During Kirk's meeting with HR employee Uwen on January 17, 2019, Ms. Uwen brought Kirk to meet with her boss, McGeorge's HR Manger (name unknown). The HR Manager began interrogating Kirk about his prior heart attack that he suffered in 2018. This line of inquiry was irrelevant to Kirk's request for surgery leave. The HR Manager also told Kirk how lucky he was to have disability insurance, and that it would pay him benefits while he was out. She (the HR Manager) also recommended that Kirk change his health insurance plan to a $5,000 deductible plan, which Kirk declined.

30. On the same day following his meeting with the HR Manager, Kirk observed the HR manager and Bob Farlow, the General Sales Manager, meeting together in a conference room, then later meeting in Farlow's office.

31. The very next morning, January 18, 2019, Kirk was terminated within minutes after arriving to work.

32. At Kirk's termination meeting, General Manager Bob Farlow, Sales Manager Tony Thaxton, and Sales Manager Chris McDonnell were present.

33. Thaxton informed Kirk that McGeorge was terminating him. Kirk asked why. General Manager Farlow stated lack of performance. Chris McDonnell, who only days earlier gave Kirk a good performance review, was present and would not look Kirk in the eye. Kirk

asked Farlow what he meant. Farlow replied, "Lonnie, you have too many health problems," that he needed to "get healthy," and that he was no good to McGeorge or himself until he got healthy, at which time he could "come back and see us." Kirk asked about his health and disability insurance. Farlow said that Kirk would be covered by insurance as long as he had his surgery before the end of the month. Farlow said there would be a two-week waiting period before short-term disability benefits would begin. Lastly, Farlow said that McGeorge would pay Kirk a final draw of $800 given Kirk's upcoming surgery, which he would not have to repay.

34. At the time of his termination, Kirk had a least two car sales lined up which were completed by other sales people without Kirk receiving any commission.

35. Following his termination, Kirk attempted to apply for short-term disability benefits. McGeorge was not cooperative in providing Kirk with the paperwork he needed.

36. At some point, Tracy Uwen, the HR employee, informed Kirk that he would not qualify for short-term disability benefits because he was terminated prior to his surgery.

37. Kirk was terminated five days before he underwent surgery on January 23, 2019.

38. McGeorge never paid Kirk the extra draw promised by General Manager Farlow.

39. McGeorge terminated Kirk because of his disability, and/or to interfere or prevent him from health, short/long-term benefits.

40. Dupuytren's meets the definition of disability under the ADA because it substantially limits the use of Kirk's hand and major life activities including lifting and performing manual tasks. Kirk also has a record of disability under the ADA because he survived a previous heart attack. Heart disease meets the definition of disability under the ADA.

41. McGeorge failed to provide Kirk with a reasonable accommodation of disability leave, after which he could have returned to work.

42. McGeorge failed to engage in any interactive process with Kirk.

43. Kirk was able to perform the essential functions of his job with or without the reasonable accommodation that he be given short-term leave to receive, and recover from, surgery.

44. The day before terminating Kirk, McGeorge's HR Manager questioned Kirk about his prior heart attack, revealing an intent to discriminate against Kirk based on his record of disability.

45. After learning about Kirk's request for surgery and his prior heart attack, McGeorge's HR Manager met with General Manager Farlow.

46. GM Farlow's statement that Kirk had too many health problems and that he was no good to McGeorge until he got "healthy" is direct evidence of discrimination because of disability under ADA.

47. McGeorge terminated Kirk rather than providing him with a reasonable accommodation under ADA. McGeorge had no good reason for denying a two-week leave period as a reasonable accommodation to Kirk.

48. Kirk was able, and following leave for his surgery, would have continued to be able, to perform the essential functions of the Car salesman position, just as he had for the six-plus months prior to his termination.

49. McGeorge intentionally discriminated against Kirk because of his disability, and/or to interfere with his eligibility for ERISA benefits.

50. Once McGeorge terminated Kirk, he immediately lost eligibility under McGeorge's ERISA plan for the short/long term disability benefits for which he would have been eligible to receive to cover his lost wages while out of work for his surgery. But for

7

McGeorge's unlawful termination, Kirk would have received such benefits.

51. Following McGeorge's termination of Kirk on January 18, 2019, he lost eligibility under McGeorge's ERISA plan for health insurance benefits effective January 31, 2019. Fortunately for Kirk, his surgery on January 23, 2019 was covered by his health insurance, but his health benefits were terminated and did not cover any physical therapy or related treatment from February 1, 2019 forward, for which he would have been eligible to cover the cost of rehabilitation from his surgery. But for McGeorge's unlawful termination, Kirk would have received such benefits.

52. Kirk has suffered serious financial hardship and emotional damages as a result of McGeorge's unlawful termination and interference with his ERISA right to receive benefits, and as a result of his unlawful termination in violation of the ADA.

53. McGeorge acted with malice or reckless indifference to Kirk's rights under the ADA and ERISA.

**Exhaustion of EEOC Administrative Remedies.**

54. On or around October 31, 2019, Kirk filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

55. The EEOC investigated and issued a Determination Letter finding reasonable cause to conclude that McGeorge violated the ADA by terminating Kirk the day following his request for leave for his surgery and being questioned about his prior heart attack.

56. The EEOC issued a Notice of Right to Sue on December 17, 2020.

**COUNT 1**
**Discrimination in Violation of the ADA**

57. Title I of the ADA prohibits employers with at least 15 employees from discriminating against qualified individuals with a disability.

58. Plaintiff is a "qualified individual with a disability" as defined by the ADA.

59. Plaintiff informed Defendant of his disability and the need for reasonable accommodation.

60. Plaintiff could perform the essential functions of his position with or without a reasonable accommodation.

61. Plaintiff informed McGeorge of his disability and requested a brief leave of absence to undergo hand surgery in connection with his disability. This constituted a request for a "reasonable accommodation" under the ADA.

62. Defendant refused to engage in an interactive process in good faith, refused to provide Plaintiff with a reasonable accommodation, retaliated against Plaintiff for requesting an accommodation, and terminated Plaintiff because of his disability, request for reasonable accommodation, and/or record of disability in violation of the ADA.

63. Farlow's statement that Kirk had too many health problems and that he needed to "get healthy" was made in connection with his termination. This is direct evidence that McGeorge disparately treated Kirk because of his disabilities or record of disability.

64. McGeorge's termination of Kirk the day following his request for a reasonable accommodation is evidence that McGeorge unlawfully retaliated against Kirk for engaging in the protected activity of requesting an accommodation.

65. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, continues to suffer, and will in the future suffer injury and damages, including embarrassment, inconvenience, humiliation, mental anguish, pain, suffering, loss of income, and loss of benefits including retirement benefits.  Plaintiff is entitled to injunctive and declaratory relief, litigation expenses including attorneys' fees, and other relief.

## COUNT 2
## Violation of ERISA

66. Section 510 of ERISA, 29 U.S.C. Sec. 1140, makes it unlawful "to discharge ... or discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled."

67. Plaintiff was a participant, and exercised his right to participate in Defendant's employee welfare benefit plans including healthcare and short/long-term disability benefit plans.

68. Defendant's employee health and short/long term benefits are "welfare benefits" protected by ERISA.

69. Defendant terminated Plaintiff's employment for the purpose of interfering with Plaintiff's future use of his health and short/long-term disability welfare benefits. In so doing, Defendant discriminated against Plaintiff in violation of 29 U.S.C. § 1140.

70. As a direct and proximate result of Defendant's unlawful interference and discrimination, Plaintiff has suffered and will continue to suffer injury and damages including loss of income and benefits, inconvenience, mental anguish, litigation expenses including attorneys' fees, consequential damages and other injury.

## Relief Requested

Wherefore, Plaintiffs requests the following Relief against Defendant:

    A. Money damages, including back pay, for lost wages and benefits;

    B. Compensatory damages;

    C. Punitive damages;

    D. Pre-judgment and post-judgment interest;

    E. An order reinstating Plaintiff's employment with Defendant, with full seniority and credit towards retirement as if he was never terminated, or front pay (for

lost wages and all benefits) in lieu of reinstatement;

  F. An order granting appropriate equitable and/or injunctive relief under the ADA or ERISA including the enjoining and permanent restraining of future violations and direction to Defendant to take such affirmative action as is necessary to insure no continuing effects of the past unlawful practices;

  G. For an award of a separate amount, in addition to the awards against Defendant, to offset the adverse tax effects of lump sum payments of damages and/or back or front pay;

  H. Attorneys' fees and costs expended in the prosecution of this case;

  I. Any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY**.

        Respectfully submitted,
        **Lonnie Kirk**
        Plaintiff


        By:___/s/_____
        Craig Juraj Curwood (VSB No. 43975)
        Paul M. Falabella (VSB No. 81199)
        BUTLER CURWOOD, PLC
        140 Virginia Street, Suite 302
        Richmond, VA 23219
        Telephone: (804) 648-4848
        Fax: (804) 237-0413
        craig@butlercurwood.com
        paul@butlercurwood.com

        *Attorneys for Plaintiff*